STATE of Indiana, Appellant–Plaintiff,

v.

Robert M. FOY, Appellee–Defendant.

No. 68A05–0605–CR–235.

Court of Appeals of Indiana.

March 19, 2007.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Michael J. Alexander, Muncie, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

The State charged Robert Foy with murder. Foy filed a motion to suppress, which the trial court granted. Foy cross-appeals and raises the following restated issues:

1. Did the trial court err in granting the State's belated motion to file an interlocutory appeal?

2. Was the warrant supported by probable cause?

The State appeals and presents the following restated issue:

3. Did the trial court err in granting Foy's motion to suppress?

We affirm in part, reverse in part, and remand.

The following account comes largely from Stephen McCord's, an investigator with the Randolph County Sheriff's Department (RCSD), probable cause affidavit in support of the search warrant. Around 3:30 p.m. on April 22, 2004, Carol Jones placed a 911 call and informed the opera-

tor that a deceased woman, later identified as Diane Foy, Foy's wife, was in the Foys' residence located at 4050 South County Road 110 West, in Randolph County, Indiana. The record is unclear about why Jones entered the residence. Foy informed Jones that Diane had recently left on a motorcycle, and that approximately twenty minutes later he found her floating face down in a nearby pond. Foy further claimed he removed Diane from the pond, carried her into their residence, and placed her on a couch.

Jones informed the 911 operator that Diane was still on the couch, and the 911 operator instructed Jones to relocate Diane to the floor and administer CPR. At some point after this instruction, Jones stated "Oh God, I think he killed her[,]" and "Oh my God, what did he do to her." *Appellant's Appendix* at 20. Jones also told the 911 operator that Diane appeared to have bruises on her neck, arm, and head.

Later that day, McCord traveled to the Foys' residence. Upon his arrival, McCord was informed that emergency personnel found Diane's body and clothing dry. McCord was also told that when the emergency personnel first arrived, there was a bloody cloth near Diane's body, but that the cloth disappeared by the time Diane was taken to the hospital. Emergency personnel also observed "a red substance" on Foy's clothing and skin, and abrasions on his hands. The attending physicians and nurses at Ball Memorial Hospital found no water in Diane's lungs and noted the purported cause of death was inconsistent with her injuries.

McCord filed a probable cause affidavit in support of the issuance of a search warrant that same day (April 22). McCord's affidavit contained the foregoing facts and stated he "believe[d] and [was] presuming this to be a homicide investiga-

tion." *Id.* at 22. Based upon McCord's affidavit, a search warrant was issued that authorized a search for "[a]ny and all trace evidence" on Foy's person and in the Foys' residence and any outbuildings and vehicles thereon. *Id.* at 16.

That evening, RCSD personnel executed a search, which resulted in the seizure of specimens from Foy's and Diane's bodies and over sixty items of personal property, including: (1) "potential blood smears" on Foy's left forearm, right hand, and left hand; (2) "[r]ed stain[s]" on all of the following—a napkin, a torn denim shirt, a bathroom window frame, a bed sheet on a bed located in the master bedroom, the kitchen floor, a handrail, steps leading to the basement, the bottom stair step, near a bed located in the basement, the ceiling in the pool room, a sofa in the pool room, a sock in the living room, a chair in the living room, several places on the living room wall, a wall near the front door, the floor near a sofa in the living room, several places on a sofa in the living room, the computer screen, the floor near the dining room table, the dining room carpet, a ceramic flower pot in the dining room, a comforter, a mattress pad, a "white throw", a sock near the kitchen doorway, a green towel from the floor of the master bedroom, a pair of blue jeans located near the bathroom, a sock located near the bedroom, panties located near the bedroom, a shirt in the pool room, a slipper in the pool room; and (3) "[r]ed stain[s]" on panties, a shirt, and blue jeans worn by Diane at the time of her death. *Id.* at 25–26.

On April 29, 2004, the State charged Foy with murder. Nearly one year later, on April 25, 2005, Foy filed a motion to suppress the evidence seized pursuant to the search warrant. The trial court concluded the search warrant was supported by probable cause, but found the search warrant lacked the necessary particularity

and, therefore, granted Foy's suppression motion on January 27, 2006. On March 2, the State filed a "Motion to File a Belated Motion Requesting Certification of an Interlocutory Order[,]" *id.* at 7, and filed a "Motion Requesting Certification of an Interlocutory Order" on March 23, 2006. *Id.* at 104. On March 23, over Foy's objection, the trial court granted the State's motion.

On April 4, 2006, the trial court certified the State's interlocutory appeal and on May 4, the State filed in this court a motion requesting that we accept jurisdiction of its interlocutory appeal, which was granted on July 11. On July 12, the State filed its notice of appeal. Thereafter, on September 19, 2006, Foy filed a motion to dismiss the State's interlocutory appeal. This court issued an order on November 2, in which we held in abeyance Foy's motion to dismiss. Oral argument regarding Foy's motion to dismiss was held in Indianapolis on January 24, 2007. Further facts will be included as necessary.

1.

Foy contends the State's interlocutory appeal should be dismissed for lack of jurisdiction because the State failed to file a certification motion within thirty days of the issuance of the trial court's interlocutory order. Subject matter jurisdiction concerns a court's ability to hear and decide a case based upon the class of cases to which it belongs. *Cardiology Assoc. of Nw. Ind., P.C. v. Collins,* 804 N.E.2d 151 (Ind.Ct.App.2004). It is this court's duty to determine whether we have jurisdiction before determining the rights of the parties on the merits. *Bridgestone Americas Holding, Inc., et al. v. Mayberry, et al.,* 854 N.E.2d 355 (Ind.Ct.App. 2006), *trans. pending.* "Further, a court always has jurisdiction to consider its own jurisdiction." *Id.* at 358.

This case comes to us from the trial court's grant of Foy's suppression motion and, therefore, this appeal is interlocutory in nature. *See Frensemeier v. State,* 849 N.E.2d 157, 159 (Ind.Ct.App.2006) ("interlocutory appeal challenging the denial of his motion to suppress"), *trans. denied.* The Indiana Rules of Appellate Procedure provide that we have jurisdiction over appeals of interlocutory orders under Appellate Rule 14. Ind. Appellate Rule 5(B); *Bridgestone Americas Holding, Inc., et al. v. Mayberry, et al.,* 854 N.E.2d 355. Pursuant to App. R. 14, there are three ways we may obtain jurisdiction over an interlocutory appeal: (1) App. R. 14(A) permits interlocutory orders as of right; (2) App. R. 14(B) permits discretionary appeals "if the trial court certifies its order and the Court of Appeals accepts jurisdiction over the appeal"; and (3) App. R. 14(C) authorizes other interlocutory appeals only as provided by statute. *Bridgestone Americas Holding, Inc., et al. v. Mayberry, et al.,* 854 N.E.2d 355. Neither App. R. 14(A) nor (C) apply to the present case and, thus, our jurisdiction over this appeal is discretionary and must derive from App. R. 14(B). *Id.*

App. R. 14(B) states, "[a]n appeal may be taken from ... interlocutory orders if the trial court certifies its order and the Court of Appeals accepts jurisdiction over the appeal." The rule clearly provides that the only prerequisite for this court to accept a discretionary interlocutory appeal is certification of the order by the trial court. *Bridgestone Americas Holding, Inc., et al. v. Mayberry, et al.,* 854 N.E.2d 355. In this case, the trial court certified its order suppressing certain evidence, and the State filed a motion with this court to accept jurisdiction of the appeal, which we granted. The two requirements of App. R. 14(B) were therefore satisfied, and we have jurisdiction to review the trial court's order. *See id.* (jurisdiction where trial

court certified its order and we granted appellant's certification motion).

■■■ Nonetheless, we must still determine whether the trial court properly granted the State's certification motion. We are not bound by a trial court's determination on the issue of certification, *Cardiology Assoc. of Nw. Ind., P.C. v. Collins,* 804 N.E.2d 151, and the trial court's certification is subject to review for an abuse of discretion. *Troyer v. Troyer,* 686 N.E.2d 421 (Ind.Ct.App.1997). Pursuant to App. R. 14(B)(1)(a), a party generally must bring a motion requesting certification of an interlocutory order within thirty days of the date of the interlocutory order unless, for good cause, the trial court permits a belated motion. In the event the trial court grants a belated motion and certifies the appeal, it "shall make a finding that the certification is based on a showing of good cause, and shall set forth the basis for that finding." App. R. 14(B)(1)(a).

We have not previously defined "good cause" within the meaning of App. R. 14(B). Foy directs our attention to a number of cases addressing former Ind. Supreme Court Rule 2–2. *See, e.g., Eggers v. Wright,* 253 Ind. 44, 245 N.E.2d 331 (1969); *Deckard v. State,* 241 Ind. 338, 170 N.E.2d 424 (1961); *Barker v. State,* 242 Ind. 5, 175 N.E.2d 353 (1961). Former Supreme Court R. 2–2, however, is not sufficiently analogous to control the resolution of this issue because: (1) it allowed only for an extension of time to file made before the filing deadline had passed and did not permit a belated filing; (2) it authorized an extension only upon a showing of due diligence rather than good cause; and, most importantly (3) under Rule 2–2, " 'the timely filing of a transcript and assignment of errors [wa]s jurisdictional.' " *Eggers v. Wright,* 245 N.E.2d at 333 (quoting *Brindle v. Anglin,* 246 Ind. 601, 208 N.E.2d 476, 477 (1965)). As we concluded above,

the only jurisdictional prerequisite in this case, *i.e.,* certification by the trial court, was satisfied.

The trial court granted Foy's suppression motion on January 27. On March 2, four days late, the State filed a belated motion requesting permission to certify an interlocutory appeal. In its order granting the State's motion to file a belated motion, the trial court determined its certification was based upon a good cause showing, stating "the State's failure to timely file the appropriate Motion was not based upon a disregarding of the time limit involved, but rather a mistake in calculation" of the time available to file the certification motion. *Correction of Information Contained in Appellant's Case Summary and Supplementation of Record Before Court* at Exhibit 2, p. 1. Under these facts, we cannot say the trial court abused its discretion when it found good cause to permit the State's belated motion and certified the interlocutory appeal.

2.

■■■ Foy contends the trial court erred when it found the search warrant was supported by probable cause. In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. *State v. Spillers,* 847 N.E.2d 949 (Ind.2006). The reviewing court's duty is to determine whether the issuing magistrate had a "substantial basis" for concluding that probable cause existed. *Id.* at 953. A substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. *State v. Spillers,* 847 N.E.2d 949.

A "reviewing court" for this purpose includes both the trial court ruling on a suppression motion and an appellate court reviewing that decision. *Id.* at 953. Although we review *de novo* the trial court's substantial-basis determination, we afford the magistrate's determination significant deference as we focus on whether reasonable inferences drawn from the totality of the evidence support that determination. *State v. Spillers,* 847 N.E.2d 949.

The Fourth Amendment to the U.S. Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article 1, Section 11 of the Indiana Constitution contains nearly identical language. These constitutional principles are codified in Ind.Code Ann. § 35–33–5–2 (West, PREMISE through 2006 2nd Regular Sess.), which details the information to be contained in an affidavit for a search warrant. Where a warrant is sought based upon hearsay information, the affidavit must either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

I.C. § 35–33–5–2(b)(1), (2).

▪▪▪ "[U]ncorroborated hearsay from a source whose credibility is itself unknown, standing alone, cannot support a finding of probable cause to issue a search warrant." *Jaggers v. State,* 687 N.E.2d 180, 182 (Ind.1997). For the purpose of proving probable cause, the trustworthiness of hearsay can be established in a number of ways, including where: (1) the informant has given correct information in the past; (2) independent police investigation corroborates the informant's statements; (3) some basis for the informant's knowledge is demonstrated; or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. *State v. Spillers,* 847 N.E.2d 949. These examples are not exclusive. *Id.* Depending upon the facts, there may be other considerations in establishing the reliability of the informant or hearsay. *Id.*

McCord's probable cause affidavit is based largely on information provided to him by the 911 dispatcher, other officers, and emergency and ambulance personnel. The substantial majority of the information contained in McCord's affidavit, therefore, may be fairly characterized as hearsay.

The information provided by the 911 dispatcher derives from Jones's 911 call. Jones informed the 911 dispatcher that: she, Diane, and Foy were in the Foys' residence; she believed Diane was dead (although Diane had yet to be pronounced dead); Foy claimed he found Diane floating face-down in a nearby pond; Diane had bruises on her arm and a contusion on her head; and Foy had somehow harmed Diane. While the affidavit does not indicate whether Jones was a "professional informant" or known to the police before the investigation, the probable cause affidavit shows that her statements were corroborated by further police investigation, which demonstrates the trustworthiness of the information she provided. *See State v. Spillers,* 847 N.E.2d 949 (independent police investigation corroborates the informant's statements). Further, the basis for Jones's knowledge was her personal observation. *See id.* (some basis for the informant's knowledge is demonstrated). This

hearsay, therefore, cannot be characterized as uncorroborated, and the trustworthiness of the hearsay was sufficiently established. *See Soliz v. State*, 832 N.E.2d 1022 (Ind.Ct.App.2005) (probable cause existed for issuance of search warrant where first-time informant's statements were corroborated by police), *trans. denied.* Additionally, we note "[i]t is well settled that police officers may rely upon dispatches from their own and other departments." *State v. Hornick*, 540 N.E.2d 1256, 1258 (Ind.Ct.App.1989).

McCord's affidavit is also based upon information provided to him by other officers, whom he refers to as "first responding officers" or "first responders". *See, e.g., Appellant's Appendix* at 21. Those officers informed McCord that, upon their arrival: "there existed a bloody cloth lying near or about [Diane], and that having last viewed [ ] Foy leaving the room, first responders noted the absence of that bloody cloth." *Id.* We first note that, although the "first responding officers" did not testify in front of the issuing magistrate, "the existence of probable cause to arrest is determined upon the basis of the collective information known to the law enforcement organization[.]" *State v. Hornick*, 540 N.E.2d at 1258. Additionally, the first responding officers personally observed Foy at the Foys' residence. This hearsay, therefore, was sufficiently trustworthy. *See State v. Hornick*, 540 N.E.2d 1256 (suppression of evidence clearly erroneous because officers' observations established probable cause).

Finally, McCord's affidavit is based in part upon statements made by emergency and ambulance personnel. Specifically, emergency and ambulance personnel informed McCord that: Foy had "a red substance" on his clothing and skin and "appeared to have abrasions on ... his hands[,]" *Appellant's Appendix* at 22; Di-

ane's body and clothing were dry; and Diane's injuries were inconsistent with Foy's assertion regarding her cause of death (*i.e.*, drowning) because Diane's lungs contained no water. The basis of the emergency and ambulance personnel's knowledge was their personal observations of Diane and conclusions drawn therefrom, which demonstrates trustworthiness and supports the finding of probable cause. *See State v. Spillers*, 847 N.E.2d 949 (some basis for the informant's knowledge is demonstrated).

This case is wholly dissimilar from those involving an anonymous or confidential, unnamed informant in which the reliability of hearsay information is often dubious or, at least, reasonably in doubt. To the contrary, the hearsay information in this case came from law enforcement officers, emergency and medical professionals, and someone in the alleged victim's home who called 911 seeking medical help rather than to report criminal activity. The information provided a sufficient basis of fact to permit a reasonably prudent person to believe a search of the Foys' residence would uncover evidence of a crime. *Esquerdo v. State*, 640 N.E.2d 1023 (Ind. 1994). Based upon the totality of the evidence, there was a substantial basis for concluding that probable cause existed. *See State v. Fridy*, 842 N.E.2d 835 (Ind.Ct. App.2006) (granting defendant's suppression motion was error where police provided sufficient corroboration to overcome hearsay hurdle and established that search warrant was supported by probable cause).

**3.**

▮ The State contends the trial court erred in granting Foy's motion to suppress because, it asserts, the search warrant was sufficiently particular. Both the U.S. and Indiana Constitutions proscribe general search warrants. *See* U.S. Const. amend. IV; Ind. Const. art. 1, § 11.

A warrant must describe both the place to be searched and the items to be seized. *Overstreet v. State*, 783 N.E.2d 1140 (Ind. 2003), *cert. denied*, 540 U.S. 1150, 124 S.Ct. 1145, 157 L.Ed.2d 1044 (2004). "A warrant conferring upon the executing officer unbridled discretion regarding the items to be searched is invalid." *Cutter v. State*, 646 N.E.2d 704, 710 (Ind.Ct.App.1995), *trans. denied.* While the items to be searched for and seized must be described with some specificity, an exact description is not required. *Overstreet v. State*, 783 N.E.2d 1140. "In practice, courts have therefore demanded that the executing officers be able to identify the things to be seized with reasonable certainty and that the warrant description be as particular as circumstances permit." *U.S. v. Lievertz*, 247 F.Supp.2d 1052, 1062 (S.D.Ind.2002) (quoting *U.S. v. Brown*, 832 F.2d 991, 996 (7th Cir.1987), *cert. denied*, 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 243 (1988)).

■ In this case, the warrant authorized a search of "the residence, out buildings[,] and motor vehicle(s) located at 4050 South County Road 1100 West, County of Randolph, State of Indiana [ (*i.e.*, the Foys' residence) ]" and "the person of Robert Foy" for "[a]ny and all trace evidence." *Appellant's Appendix* at 16. Foy argues this was a general warrant because the phrase "[t]race evidence" is "without limitation as to the type of evidence referred to or the offense being investigated[.]" *Appellee's Brief* at 5. The State counters that "[c]ontrary to [Foy's] assertion, and the trial court's finding, this was not an improper general warrant. Rather, this was a warrant, supported by probable cause, that used an accepted term of art that reflected the early stage of a suspected murder investigation. That term is 'trace evidence.'" *Appellant's Brief* at 7.

We begin by noting that although the search warrant did not specifically state it was being issued as part of a murder investigation, "a true and correct copy of [McCord's] affidavit [was] attached [t]hereto[,]" *Appellant's Appendix* at 16, and was clearly incorporated into the warrant. *See id.* ((1) "the sole basis for such determination being the affidavit signed, sworn to, and set out hereafter"; (2) "[t]his warrant, issued pursuant to the foregoing affidavit"; and (3) "[t]he goods and chattels or any part thereof described in the affidavit ... shall be brought to [the magistrate's] office"). Further, in his affidavit, McCord stated he "believe[d] and [wa]s presuming this to be a homicide investigation." *Id.* at 22. Indeed, McCord could state the matter with no more certainty than he did because Diane had not yet been pronounced dead. Contrary to Foy's assertion, therefore, the warrant was not without limitation as to the type of offense being investigated.

■ We are still left, however, to determine the validity under these circumstances of a search for "trace evidence." The most analogous Indiana case discussing trace evidence in a similar context is *Warren v. State*, 760 N.E.2d 608 (Ind. 2002). In *Warren*, the defendant was convicted of murder and robbery. The defendant appealed his conviction, arguing the trial court committed reversible error by denying his suppression motion predicated on a faulty search warrant because it was "without any practical limit as to the items for which a search may be conducted." *Id.* at 610. The warrant listed the items to be seized as "guns, ammunition, gun parts, lists of acquaintances, blood, microscop0ic [sic] or *trace evidence*, silver duct tape, white cord and any other indicia of criminal activity including but not limited to books, records, documents, or any other such items." *Id.* (emphasis supplied, alteration in original).

Although the Supreme Court agreed with the defendant that "the phrase 'any other indicia of criminal activity including but not limited to books, records, documents, or any other such items' grants an officer unlawful unbridled discretion to conduct a general exploratory search[,]" the Court ultimately affirmed the trial court's denial of the defendant's suppression motion. *Id.* In so doing, the Supreme Court reasoned that "[t]he infirmity of this catchall language does not doom the entire warrant, however, but rather only requires the suppression of the evidence seized pursuant to that part of the warrant but not the suppression of the evidence obtained pursuant to the valid specific portions of the warrant." *Id.* The Supreme Court, therefore, lumped "trace evidence" together with the "valid specific portions of the warrant" rather than with the invalid "catchall language[.]" *Id.*

The disapproval of the phrase "any other indicia of criminal activity including but not limited to books, records, documents, or any other such items" combined with an absence of any adverse comment about the phrase "trace evidence" suggests the Supreme Court does not consider its inclusion in a warrant impermissible or believe the phrase renders a warrant unconstitutionally general. *Id.* There are also authorities that refute Foy's assertion that the phrase "trace evidence" imposes no "limitation as to the type of evidence referred to...." *Appellee's Brief* at 5. *See Kriner v. State,* 699 N.E.2d 659, 662 (Ind. 1998) ("fingerprints, hairs, or other trace evidence"); *id.* at 665 ("trace evidence expert would have testified [about] ... blood and glass") (citation and internal quotations omitted); *Wade v. State,* 490 N.E.2d 1097 (Ind.1986) (witness qualified as trace evidence expert for purpose of comparing enlarged photo of defendant's shoe with wound on victim's head); *Forrester v. State,* 440 N.E.2d 475, 480 (Ind.1982) (wit-

ness testified that "trace evidence deals with things like ... latent fingerprints, arson examinations, physical comparisons and ... hair and fiber examinations"); *Julian v. State,* 811 N.E.2d 392, 400 (Ind. Ct.App.2004) ("[t]race [e]vidence [a]nalyst ... to testify regarding ... red fibers"), *trans. denied; see also* Federal Bureau of Investigations Laboratory, Trace Evidence Unit, *http://www.fbi.gov/hq/lab/org/teu.htm* (last visited Feb. 8, 2007) ("trace materials include human hairs, animal hairs, textile fibers and fabric, ropes, feathers, and wood"); Indiana State Police Bureau of Criminal Investigation, Laboratory Division, *http://www.in.gov/isp/bci/lab/* (last visited Feb. 8, 2007) ("trace evidence", fiber, glass, fire debris, paint).

Beyond *Warren,* there is no Indiana case law examining the validity of search warrants authorizing the seizure of trace evidence. In light of this paucity, the State directs our attention to *State of Washington v. Clark,* 143 Wash.2d 731, 24 P.3d 1006 (2001), *cert. denied,* 534 U.S. 1000, 122 S.Ct. 475, 151 L.Ed.2d 389 (2001). In *Clark,* the defendant was convicted of, among other things, murder, and challenged his sentence of death in part upon the basis that "because the ... search warrant merely authorized a search for trace evidence it failed to meet the constitutional requirement of particularity...." *Id.* at 1017. The Washington Supreme Court disagreed with the defendant and concluded the warrant authorizing a search for "trace evidence" did not amount to a general warrant because, "[a]s a term of art, 'trace evidence' means 'small items of a foreign material left on another,' of which there are many possible types, including 'blood, hairs, [and] fibers....' " *Id.* at 1018 (citations omitted). Within the context of the circumstances of the case, the Court reasoned that "[d]ue to the inherent size and multiplicity of kinds of

trace evidence [in a murder investigation], their prior identification in a warrant is impossible and thus a generic classification ... is appropriate." *Id.*

The U.S. District Court for the Western District of Pennsylvania came to a similar conclusion in *U.S. v. Atwell,* 289 F.Supp.2d 629 (W.D.Pa.2003). In *Atwell,* the defendant was being investigated in connection with the disappearance of a third person, and in the course of that investigation, law enforcement authorities uncovered evidence that the defendant possessed and published a "United States obligation[.]" *Id.* at 632. The search warrant in *Atwell* authorized a search of "[a]ny and all physical evidence including but not limited to: [s]uspected blood stains and other trace evidence that may aid in determining the disappearance and whereabouts of Joseph T. Donato." *Id.* at 632. The search resulted in the seizure of numerous items from the defendant's home, including: carpeting and paneling with suspected blood stains; blood soaked items including a blanket, washcloth and clothing; a door containing an apparent bullet fragment; assorted ammunition; and various drug related items. The defendant challenged the warrant, taking "special exception to the use of the term 'trace evidence'...." *Id.* at 636. The District Court concluded "the [ ] search warrant was not invalid as a general warrant" because "it confined the search to [the defendant's] residence[,] ... limited the discretion of those officers executing the warrant[,] and permitted them to make a rational determination as to what items could properly be taken as potential evidence...." *Id.* at 635.

Specifically addressing the constitutionality of the phrase "trace evidence," the District Court stated:

[T]he officers executing the warrant did not have unbridled discretion to seize any item *carte blanche* because the warrant made clear that the search was being conducted in the context of a homicide investigation. Therefore only "trace evidence" reasonably related to [the victim's] disappearance could be seized.

Moreover, there is nothing objectionable about the inclusion of "trace evidence" language, given the nature of the investigation and the unknowns as to what specifically had happened to [the victim]. As in many cases of suspected homicide, it was perfectly logical for the officers to search for items such as [the victim's] blood, hair, fibers, [and] fingerprints, ... since those items might well link [the defendant] to [the victim] at or near the time of [the victim's] disappearance. We agree with the government's position that, because of the factual uncertainties surrounding [the victim's] disappearance, it would have been impossible for the officers to anticipate each and every type of evidence that might be found at [the defendant's] house. Furthermore, the reality that these items may be small (and therefore might be found in any small container) is an unfortunate fact of life for [the defendant] but does not render the warrant invalid. It is well established that a warrant can be "indubitably broad" without being impermissibly general. It is not the magnitude of the search which determines its permissibility but whether the search and seizures were reasonable under all the circumstances.

*Id.* at 636–37 (footnotes and citations omitted).

Applying these standards to the facts in this case, we find the search warrant was not invalid as a general warrant. *See U.S. v. Johnson,* 690 F.2d 60, 64 (3rd Cir.1982) (upholding warrants that contain a general authorization to seize "instrumentalities of the commission of the crime of conducting

an illegal gambling business" and noting that "the nature of the crime is such that these instrumentalities are reasonably subject to identification, and the in-premises conduct of such illegal activities would make greater particularity impossible"), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 450 (1983). The warrant confined the search to Foy and the Foys' residence (including out buildings and vehicles) and permitted seizure of "any and all trace evidence" that might be relevant in determining Diane's death within the context of a murder investigation. This description of the premises to be searched and the items to be seized appropriately limited the discretion of those officers executing the warrant and permitted them to make a rational determination as to what items could properly be taken as potential evidence. *Warren v. State*, 760 N.E.2d 608.

The circumstances of the case and the nature of the crime under investigation helped to define the parameters of relevant evidence, thus satisfying the particularity requirement. *U.S. v. Atwell*, 289 F.Supp.2d 629.

> If officers are to be confined to the description in the warrant, reasonable latitude must be allowed in describing the items sought. So long as the description is as specific as the circumstances of the particular case permit, and probable cause is shown, the warrant will be upheld. To hold otherwise would be to lose all touch with reality and totally defeat the policy of encouraging the use of search warrants.

*U.S. v. Robinson*, 287 F.Supp. 245, 256 (N.D.Ind.1968). The trial court, therefore, erred by granting Foy's motion to suppress the evidence seized pursuant to the search warrant. *See Warren v. State*, 760 N.E.2d 608; *U.S. v. Robinson*, 287 F.Supp. 245.

Judgment affirmed in part, reversed in part, and remanded.

KIRSCH, J., and RILEY, J., concur.